PEOPLE v JANES

Docket No. 312490. Submitted July 17, 2013, at Detroit. Decided July 25,
    2013, at 9:10 a.m.

    John Wesley Janes was charged in the 93rd District Court with
    owning a dangerous animal that caused a serious injury, MCL
    287.323(2), after Janes's pit bull attacked and bit a child. The
    court, Mark E. Luoma, J., determined that MCL 287.323(2) was a
    strict-liability offense and bound Janes over to the Alger Circuit
    Court. Janes moved to quash the bindover and dismiss the charge,
    arguing that MCL 287.323(2) required a criminal intent. The
    circuit court, William W. Carmody, J., agreed that MCL 287.323(2)
    was not a strict-liability offense, but nevertheless denied the
    motion to quash the bindover, concluding that the bindover was
    valid because there was evidence that Janes had been negligent or
    reckless and that this *mens rea* would be part of any jury
    instruction on the charge. The prosecution appealed by leave
    granted.

        The Court of Appeals *held*:

        1. Courts have generally assumed that when a legislature
    codifies a common-law crime, the statute includes a requirement
    of criminal intent. Accordingly, the omission of any mention of
    criminal intent in a statute must not be construed as eliminating
    the element from the crime. Instead, courts will infer that element
    unless the statute contains an express or implied indication that
    the legislative body wanted to dispense with it.

        2. The circuit court did not err when it determined that the
    Legislature's silence with respect to any criminal intent being
    required under MCL 287.323(2) did not render that offense a
    strict-liability crime. In 1988 PA 426, MCL 287.321 through
    287.323, the Legislature enacted a statutory scheme to deal with
    dangerous animals, providing criminal penalties for the owners of
    dangerous animals that injure or kill persons. MCL 287.323(2)
    provides that the owner of an animal that meets the definition of
    a dangerous animal in MCL 287.321(a) is guilty of a felony if the
    animal attacks a person and causes serious injury other than
    death. The Legislature's use of the present tense in the statute
    indicated that to establish a violation of MCL 287.323(2), the

prosecution must prove beyond a reasonable doubt that (1) the defendant owned or harbored a dog or other animal, (2) the dog or other animal met the definition of a dangerous animal in MCL 287.321(a) before and throughout the incident at issue, and (3) the animal attacked a person causing serious injury, as defined in MCL 287.321(e), other than death. Because the Legislature did not specifically address any particular criminal intent that must be proved to establish a violation of MCL 287.323(2) and the simple omission of the appropriate phrase regarding intent from the statute is not, by itself, sufficient to justify dispensing with an intent requirement, the element of criminal intent must be inferred absent an indication that the Legislature expressly or impliedly intended to dispense with that element.

3. In construing statutes that create public-welfare or regulatory offenses, courts may infer from silence that the legislative body did not intend to require proof of *mens rea* because public-welfare offenses generally apply to items whose character is such that a reasonable person would understand that he or she may be held strictly liable for his or her possession of the item. As long as a defendant knows that he or she is dealing with a dangerous device of a character that places the defendant in responsible relation to a public danger, the defendant should be alerted to the probability of strict regulation, and the assumption is that the legislative body intended to place the burden on the defendant to ascertain whether the conduct fell within the statute. A court should avoid construing a statute to dispense with criminal intent if doing so would criminalize a broad range of apparently innocent conduct, and dangerousness alone does not put the average person on notice of the potential for strict liability. A significant portion of Michigan's citizens own dogs, and almost all dogs have the potential to inflict injury, that is, they are in some general sense dangerous. The danger posed by dogs in the general sense is not such that it alerts an individual to probable regulation that might render him or her a felon if the dog injures a person. Thus, rather than enacting a public-welfare offense, the Legislature instead intended to impose criminal liability under MCL 287.323(2) only when the owner knew that his or her animal possessed the characteristics that brought it within the statutory definition of a dangerous animal.

4. MCL 287.323(3) and (4) provide criminal penalties when an owner has an animal that was previously adjudicated to be a dangerous animal and causes an injury that is not serious or allows the animal to run at large. MCL 287.321(a) also includes excep-

tions to the definition of "dangerous animal." The statutory scheme as a whole, however, does not show a legislative intent to dispense with proof of criminal intent.

5. The circuit court did err by imposing a negligence standard. Janes also incorrectly contended that the prosecution must prove that his gross negligence caused the injuries at issue. While caselaw has held that MCL 287.323(1) requires proof of the defendant's gross negligence in handling the animal that caused the victim's death, that holding was premised on the fact that MCL 287.323(1) provides that a person who violated it is guilty of involuntary manslaughter, which was a common-law offense with a criminal-intent element. None of the remaining sections in the act refer impliedly or otherwise to negligent conduct. Accordingly, the requisite intent element for a violation of MCL 287.323(2) is that the owner knew that the dog or other animal met the definition of a dangerous animal under MCL 287.321(a) before the incident at issue.

Affirmed and remanded for further proceedings.

JANSEN, J., dissenting, would have held that the Legislature intended to make the criminal offense set forth in MCL 287.323(2) a strict-liability crime. The use of the present tense in the definition of a dangerous animal in MCL 287.321(a) suggests that an animal can meet the definition the very first time it bites or attacks a person or another dog. There is no indication that an animal must have a known propensity for dangerousness to meet the definition, nor does the statute require that the animal have previously bitten or attacked a person or another dog. Accordingly, an animal may constitute a dangerous animal the very first time it bites or attacks a person or another dog. MCL 287.323(2) similarly does not require that the owner of the animal know of the animal's propensity for dangerousness. The only elements of the crime are (1) that the animal meets the definition of a dangerous animal and (2) that the animal attacks a person and causes serious injury other than death. MCL 287.323(2) is a public-welfare statute, and the criminal offense set forth in it contains no scienter requirement because the Legislature intended to shift the burden of acting at hazard to those who own and possess animals in this state. Accordingly, Judge JANSEN would have affirmed the circuit court's denial of Janes's motion to quash, but reversed the circuit court's warning to the prosecution that it will have to prove Janes's criminal intent at trial.

CRIMINAL LAW — INTENT — STRICT-LIABILITY OFFENSES — DANGEROUS ANIMALS
    CAUSING INJURY — ELEMENTS.

    MCL 287.323(2), which provides that the owner of an animal that
    meets the definition of a dangerous animal in MCL 287.321(a) is
    guilty of a felony if the animal attacks a person and causes serious
    injury other than death, is not a strict-liability offense; a convic-
    tion under MCL 287.323(2) requires proof beyond a reasonable
    doubt (1) that the defendant owned or harbored a dog or other
    animal, (2) that the dog or other animal met the definition of a
    dangerous animal in MCL 287.321(a) before and throughout the
    incident at issue, (3) that the owner knew that the dog or other
    animal met the definition of a dangerous animal before the
    incident, and (4) that the animal attacked a person and caused a
    serious injury, as defined in MCL 287.321(e), other than death.

*Bill Schuette*, Attorney General, *John J. Bursch*,
Solicitor General, and *Karen A. Bahrman*, Prosecuting
Attorney, for the people.

*Kathryn S. Denholm* for defendant.

Before: BORRELLO, P.J., and JANSEN and M. J. KELLY, JJ.

M. J. KELLY, J. In this interlocutory criminal appeal,
the prosecution appeals by leave granted the circuit
court's order denying defendant John Wesley Janes's
motion to quash his bindover on the charge of owning a
dangerous animal causing serious injury. See MCL
287.323(2). Although the circuit court denied Janes's
motion to quash, it also determined that the statute at
issue was not a strict-liability offense, as the prosecutor
contended, and it warned the prosecutor that she would
have to prove at trial that Janes had a negligent
criminal intent. On appeal, the prosecution argues that
the circuit court erred when it imposed a criminal-
intent requirement on the statutory language because
the Legislature intended MCL 287.323(2) to be a strict-
liability offense. We conclude that, although the statute
is silent on criminal intent, that silence is not disposi-
tive. The statute must be interpreted in light of the

background principles of the common law and, when read in that light, this offense is not a strict-liability offense; rather, the statute requires proof that the owner knew that his or her animal was a dangerous animal within the meaning of the dangerous animal statute before the incident at issue. For this reason, we affirm the circuit court's order and remand this case for further proceedings consistent with this opinion.

## I. BASIC FACTS

At Janes's May 2012 preliminary examination, Carol Karr testified that she assisted Cheryl Anderson with caring for Anderson's ailing mother. Karr stated that she helped Anderson at her home, which was in the country, several days each week. A few months before the incident at issue, Janes, and later his adult son, moved into Anderson's home. Janes was recovering from knee surgery at the time.

Anderson owned a cocker spaniel and, after Janes moved in with Anderson, he went to a local shelter and acquired a pit bull. Karr said that Anderson and Janes would let the dogs out into the yard and they would play. However, she saw the pit bull get aggressive with the cocker spaniel; he would "stand over the [c]ocker and not let the [c]ocker get up . . . ." She stated that the pit bull had bitten the cocker spaniel, but did not injure it.

Karr testified that, on the day at issue, Anderson had gone to work, but called to say that she expected a friend's child to visit. Anderson told Karr that the child would be dropped off by the school bus. Karr said she was on the phone when she saw the child coming up the driveway and went onto the porch to greet her. At the time, the dogs were on the wheelchair ramp in the front yard.

Karr stated that the cocker spaniel jumped on the child, but ceased when Karr told it to stop. At that point, the pit bull jumped up and bit the child's face and then her arm. Karr told the person she was speaking with on the phone to call 911 as she grabbed the child and lifted her up and away from the pit bull. The pit bull then began to attack the child's legs: "He bit her, grabbed her, started shaking her. He was pulling her out of my arms." She described the dog's demeanor as "very fierce." Karr said a neighbor heard her screaming for help and came over and used a shovel to separate the dog from the child, but even then the dog would "spin around and attack again." Eventually, Janes's son got the dog into the house and police officers arrived. Karr said that, after the dog was removed, she could see that the child had injuries to her face and arm, but she said the injuries to the child's leg were the most severe: "her knee was torn up bad right to the bone."

Karr testified that the pit bull had not, to her knowledge, threatened or attacked any people during the six weeks that she knew it. She did, however, testify that Janes's son told her that the pit bull had bitten him.

Bill Carlson testified at the preliminary examination that he was a deputy with the Alger County Sheriff's Department. He investigated the pit bull and determined that the dog had been surrendered to the local shelter on April 23, 2012, and adopted by Janes on April 27, 2012. He stated that the incident occurred on May 18, 2012.

Carlson said that the staff at the shelter were surprised to hear that the dog was involved in an attack because they thought the "dog was a friendly dog." He also contacted the previous owner and learned that the previous owner had taken the dog in as a "rehab" that

had been "abused prior to her receiving it." The previous owner had indicated that she was wary of the dog, but she did not report any attacks or biting incidents. Indeed, when she surrendered the dog she signed a statement that the " 'animal has not bitten anyone to my knowledge in the past 14 days.' " The previous owner told Carlson that she surrendered the dog because she could no longer give it the time it needed. Carlson related that, when he went to the shelter to ensure that the dog was properly secured, it charged him.

After hearing the testimony at the preliminary examination, the district court determined that MCL 287.323(2) was a strict-liability offense and that there was sufficient evidence to bind Janes over.

In June 2012, Janes moved to quash the bindover and dismiss the charge against him. Specifically, Janes argued that MCL 287.323(2) must be read to include criminal intent and, because the prosecutor had failed to present any evidence that he "caused the attack, had any knowledge or notice of the dog's dangerous nature, or that [he] acted with gross negligence," the charge must be dismissed.

In an opinion and order entered in July 2012, the circuit court agreed that MCL 287.323(2) was not a strict-liability offense, but nevertheless denied the motion to quash the bindover and dismiss the charge. The court explained that the bindover was valid because there was evidence that Janes had been negligent or reckless. It also stated that all "future proceedings shall be conducted and tried with the understanding that" this *mens rea* "shall be part and parcel of any jury instruction on the charge."

The prosecution then appealed to this Court by leave granted.

II. THE ELEMENTS OF MCL 287.323(2)

A. STANDARDS OF REVIEW

Whether the Legislature intended a statute to impose strict liability or intended it to require proof of criminal intent is a matter of statutory interpretation. *People v Quinn*, 440 Mich 178, 185; 487 NW2d 194 (1992). This Court reviews de novo the proper interpretation and application of statutes. *People v Cannon*, 481 Mich 152, 156; 749 NW2d 257 (2008).

B. BACKGROUND PRINCIPLES ON CRIMINAL INTENT

Under Michigan's common law, every conviction for an offense required proof that the defendant committed a criminal act (*actus reus*) with criminal intent (*mens rea*). *People v Likine*, 492 Mich 367, 393; 823 NW2d 50 (2012); *People v Tombs*, 472 Mich 446, 451; 697 NW2d 494 (2005) (opinion by KELLY, J.), citing *People v Rice*, 161 Mich 657, 664; 126 NW 981 (1910); *Tombs*, 472 Mich at 466 (TAYLOR, C.J., concurring), citing *People v Roby*, 52 Mich 577, 579; 18 NW 365 (1884) (COOLEY, C.J.). Criminal intent can be one of two types: the intent to do the illegal act alone (general criminal intent) or an act done with some intent beyond the doing of the act itself (specific criminal intent). *People v Langworthy*, 416 Mich 630, 639; 331 NW2d 171 (1982). Thus, when a statute prohibits the willful doing of an act, the act must be done with the specific intent to "bring about the particular result the statute seeks to prohibit." *People v Beaudin*, 417 Mich 570, 575; 339 NW2d 461 (1983).

In contrast, a strict-liability offense is one in which the prosecution need only prove beyond a reasonable doubt that "the defendant committed the prohibited act, regardless of the defendant's intent and regardless

of what the defendant actually knew or did not know."
*Likine*, 492 Mich at 393. Our Supreme Court has
recognized that the Legislature can constitutionally
enact offenses that impose criminal liability without
regard to fault. *Quinn*, 440 Mich at 188. And whether
the Legislature intended to enact a strict-liability of-
fense is generally a matter of statutory interpretation.
*Id.* at 185-188. In determining whether the Legislature
intended to dispense with criminal intent, our Supreme
Court has adopted the analytical framework first stated
by the United States Supreme Court in *Morissette v
United States*, 342 US 246; 72 S Ct 240; 96 L Ed 288
(1952). See *Quinn*, 440 Mich at 185-188.

In *Morissette*, the Court recognized that the conten-
tion that a criminal act must normally be done with
criminal intent is "no provincial or transient notion"; it
"is as universal and persistent in mature systems of law
as belief in freedom of the human will and a consequent
ability and duty of the normal individual to choose
between good and evil." *Morissette*, 342 US at 250. The
principle that an offender cannot be convicted of a
crime unless it is proved that there was a "concurrence
of an evil-meaning mind with an evil-doing hand" "took
deep and early root in American soil." *Id.* at 251-252.
And for that reason, when legislatures began to codify
the common law, courts generally assumed that those
statutes included criminal intent:

> As the state codified the common law of crimes, even if
> their enactments were silent on the subject, their courts
> assumed that the omission did not signify disapproval of
> the principle but merely recognized that intent was so
> inherent in the idea of the offense that it required no
> statutory affirmation. [*Id.* at 252.]

For these reasons, courts will not lightly presume that
the Legislature intended to dispense with the criminal

intent traditionally required at common law: "the omission of any mention of criminal intent" must not "be construed as eliminating the element from the crime." *Tombs*, 472 Mich at 454 (opinion by KELLY, J.), citing *Morissette*, 342 US at 272-273. Instead, courts will "infer the presence of the element unless a statute contains an express or implied indication that the legislative body wanted to dispense with it." *Tombs*, 472 Mich at 454.

With these background principles in mind, we shall now examine the elements of the statute at issue.

## C. THE DANGEROUS-ANIMAL STATUTE

Whether the Legislature intended to impose strict liability under MCL 287.323(2) is a matter of legislative intent. *Quinn*, 440 Mich at 185. And determining legislative intent, by necessity, must begin with a review of the language actually used by the Legislature in drafting the statute. *People v Williams*, 491 Mich 164, 172; 814 NW2d 270 (2012). When the statutory language is clear and unambiguous, this Court must enforce it as written. *Id.*

In 1988, the Legislature enacted a statutory scheme to deal with dangerous animals. See 1988 PA 426, enacting MCL 287.321 through 287.323, effective March 30, 1989. As part of that scheme, the Legislature provided criminal penalties for the owners of dangerous animals that injure or kill persons. See MCL 287.323(1) through (3). In this case, the prosecution charged Janes with violating MCL 287.323(2), which penalizes the owner of a dangerous animal that causes a serious injury:

> If an animal that meets the definition of a dangerous animal in [MCL 287.321(a)] attacks a person and causes serious injury other than death, the owner of the animal is guilty of a felony, punishable by imprisonment for not more

than 4 years, a fine of not less than $2,000.00, or commu-
nity service work for not less than 500 hours, or any
combination of these penalties.

To prove a violation of this statute, the prosecution
must prove beyond a reasonable doubt that the defen-
dant was an owner, which is defined to mean "a person
who owns or harbors a dog or other animal." MCL
287.321(c). The prosecution must also prove that the
owner's animal attacked a person and caused "serious
injury other than death" to that person. MCL
287.323(2); see also MCL 287.321(e) (defining "serious
injury" as "permanent, serious disfigurement, serious
impairment of health, or serious impairment of a bodily
function of a person"). Finally, the Legislature also
required the prosecution to prove that the animal was
one "that meets the definition of a dangerous animal."
MCL 287.323(2).

By referring to an animal "that meets" the definition
of a dangerous animal at the time that the animal
"attacks a person," the Legislature indicated that the
animal must meet the definition even before the attack
at issue. For that reason, it necessarily follows that the
prosecution cannot use the incident at issue to prove
that the animal was a dangerous animal. To hold
otherwise would be to rewrite the statute to state: If an
animal meets the definition of a dangerous animal in
MCL 287.321(a) by attacking a person and causes
serious injury other than death, the owner is guilty of a
felony. But the Legislature did not write the statute in
that way—it chose to require proof that the animal is
one "that meets" the definition *and* "attacks a person
and causes serious injury . . . ." MCL 287.323(2). The
Legislature used the present tense for both "meet" and
"attack" in the conditional clause (if the animal
"meets" the definition and "attacks" a person) to show

.

that the animal must meet the definition of a dangerous animal before and throughout the attack giving rise to criminal liability. Thus, the prosecution must prove both that the animal qualified as a dangerous animal before the incident at issue and continued to qualify as a dangerous animal throughout the incident. MCL 287.321(a); MCL 287.323(2).

Consequently, we hold that, in order to establish that a defendant violated MCL 287.323(2), the prosecution must prove beyond a reasonable doubt that (1) the defendant owned or harbored a dog or other animal, (2) the dog or other animal met the definition of a dangerous animal provided under MCL 287.321(a) before and throughout the incident at issue, and (3) the animal attacked a person causing serious injury, as defined under MCL 287.321(e), other than death.

From a review of these elements, it is apparent that the Legislature did not specifically address any particular criminal intent that must be proved in order to establish a violation of MCL 287.323(2). But the " 'simple omission of the appropriate phrase' " from the statute is not, by itself, sufficient to " 'justify dispensing with an intent requirement'. . . ." *Liparota v United States*, 471 US 419, 426; 105 S Ct 2084; 85 L Ed 2d 434 (1985), quoting *United States v United States Gypsum Co*, 438 US 422, 438; 98 S Ct 2864; 57 L Ed 2d 854 (1978). Because we must construe the statute in light of the background principles of the common law, "in which the requirement of some *mens rea* for a crime is firmly embedded," *Staples v United States*, 511 US 600, 605; 114 S Ct 1793; 128 L Ed 2d 608 (1994), we must infer that the Legislature intended some criminal intent in the absence of an indication that the Legislature expressly or impliedly intended to dispense with that element, *Tombs*, 472 Mich at 454 (opinion by KELLY, J.);

*id.* at 466 (TAYLOR, C.J., concurring). Recognizing that this Court must infer the existence of a criminal intent element unless the Legislature explicitly or implicitly provided otherwise, the prosecution argues on appeal that there is "abundant and compelling" evidence that the Legislature intended to impose strict liability under MCL 287.323(2).

### 1. PUBLIC-WELFARE STATUTE

The prosecution first argues that this offense is a "public welfare offense," which offenses do not traditionally require any criminal intent. Specifically, the prosecution contends that mere ownership of an animal—because animals are "potentially dangerous thing[s]"—is sufficient to warrant the imposition of criminal liability without regard to knowledge or intent when the animal causes death or serious injury. For that reason, the prosecution maintains, there need be no proof that the owner had "prior knowledge of the animal's particular propensity for dangerousness" or otherwise acted negligently in handling the animal.

In *Staples*, the petitioner appealed his conviction for possessing an unregistered machine gun (an assault rifle that had been modified to be capable of fully automatic fire). *Staples*, 511 US at 603. On appeal, the petitioner argued that, in order to be convicted of possessing an unregistered machine gun, the prosecutor had to prove that the petitioner "knew the weapon he possessed had the characteristics that brought it within the statutory definition of a machinegun." *Id.* at 602. In considering the matter, the Supreme Court first analyzed the statute and noted that it was silent with respect to the criminal intent necessary to convict, but this silence did not "necessarily suggest that Congress intended to dispense with a conventional *mens rea*

element, which would require that the defendant know
the facts that make his conduct illegal." *Id.* at 605.
Similarly to the case here, the prosecution in *Staples*
argued that the statute at issue was a public-welfare
offense that regulated inherently dangerous devices—
firearms—and, for that reason, Congress's silence on
criminal intent should not give rise to a "presumption
favoring *mens rea.*" *Id.* at 606.

The United States Supreme Court recognized that
the presumption in favor of imposing criminal intent as
an element does not invariably apply to public-welfare
or regulatory offenses: "In construing such statutes, we
have inferred from silence that Congress did not intend
to require proof of *mens rea* to establish an offense." *Id.*
The Court explained that public-welfare offenses gen-
erally apply to items whose character is such that a
reasonable person would understand that he or she may
be held strictly liable for his or her possession of the
item:

> In such situations, we have reasoned that as long as a
> defendant knows that he is dealing with a dangerous device
> of a character that places him "in responsible relation to a
> public danger," he should be alerted to the probability of
> strict regulation, and we have assumed that in such cases
> Congress intended to place the burden on the defendant to
> "ascertain at his peril whether [his conduct] comes within
> the inhibition of the statute." Thus, we essentially have
> relied on the nature of the statute and the particular
> character of the items regulated to determine whether
> congressional silence concerning the mental element of the
> offense should be interpreted as dispensing with conven-
> tional *mens rea* requirements. [*Id.* at 607 (citations omit-
> ted; alteration in original).]

In rejecting the prosecution's contention that the
presumption should not apply, the Supreme Court
noted that it typically avoids construing a statute to

dispense with criminal intent "where doing so would 'criminalize a broad range of apparently innocent conduct.' " *Id*. at 610, quoting *Liparota*, 471 US at 426. And it stated that dangerousness alone would not put the average person on notice of the potential for strict liability:

> Under [the prosecution's] view, it seems that *Liparota*'s concern for criminalizing ostensibly innocuous conduct is inapplicable whenever an item is sufficiently dangerous— that is, dangerousness alone should alert an individual to probable regulation and justify treating a statute that regulates the dangerous device as dispensing with *mens rea*. But that an item is "dangerous," in some general sense, does not necessarily suggest, as the Government seems to assume, that it is not also entirely innocent. Even dangerous items can, in some cases, be so commonplace and generally available that we would not consider them to alert individuals to the likelihood of strict regulation. As suggested above, despite their potential for harm, guns generally can be owned in perfect innocence. [*Staples*, 511 US at 611.]

Here, it is beyond dispute that a significant portion of Michigan's citizens own animals, including a large portion who own dogs. It is similarly beyond reasonable dispute that almost all dogs have the potential to inflict injury—that is, that dogs are, in "some general sense," dangerous. *Id*. But that being said, there has been widespread lawful ownership of dogs in this nation since before its founding. See *id*. at 610 (finding it significant that there has been a "long tradition of widespread lawful gun ownership" in the United States). And the danger posed by dogs in the general sense is not such as to "alert an individual to probable regulation" that might render him or her a felon if the dog injures a person. *Id*. at 611. As was the case in *Liparota* and *Staples*, we are reluctant to construe this statute in a way that "would impose

criminal sanctions on a class of persons whose mental state—ignorance of the characteristics of [the animal] in their possession—makes their actions entirely innocent." *Id.* at 614-615. To paraphrase the United States Supreme Court, we find it unthinkable that the Legislature intended to subject law-abiding, well-intentioned citizens to a possible four-year prison term if, despite genuinely and reasonably believing their animal to be safe around other people and animals, the animal nevertheless harms someone. See *id.* at 615. That is, we are reluctant to impute to our Legislature the intent of dispensing with the criminal-intent requirement when it would "mean easing the path to convicting persons whose conduct would not even alert them to the probability of strict regulation" under the statute. *Id.* at 616. Rather, we think that the Legislature intended to impose criminal liability under MCL 287.323(2) only when the owner *knows* that his or her animal possessed the characteristics that brought it within the statutory definition. See *id.* at 602. Indeed, we find it compelling that the Legislature has already demonstrated that it can—when it wishes—draft a statute that imposes strict liability on dog owners, but nevertheless chose not to do so here. See MCL 287.351(1) ("If a dog bites a person, without provocation . . . , the owner of the dog shall be liable for any damages suffered by the person bitten, regardless of the former viciousness of the dog or the owner's knowledge of such viciousness."). Accordingly, given the Legislature's failure to explicitly or impliedly provide for strict liability, we hold that the prosecution must prove beyond a reasonable doubt that the owner knew that his or her animal was a dangerous animal within the meaning of MCL 287.321(a) before the incident at issue.

2. STATUTORY SCHEME

We also do not agree with the prosecution's contention that the statutory scheme as a whole evinces a legislative intent to dispense with proof of criminal intent. The prosecution relies heavily on the fact that the Legislature provided for criminal penalties when an owner has an "animal previously adjudicated to be a dangerous animal" that causes an injury that is not serious or allows that animal to "run at large." MCL 287.323(3) and (4). Specifically, the prosecution contends that, by requiring prosecutors to prove that the animal was previously "adjudicated to be a dangerous animal," the Legislature indicated that those offenses require a showing that the owner had prior knowledge of the animal's dangerous character, which, the prosecution further maintains, is in stark contrast to the requirements of MCL 287.323(1) and (2). However, MCL 287.323(3) and (4) do not in fact require proof that the owner had prior knowledge of the animal's dangerous propensities—they only require that the animal, without regard to the owner's knowledge, has been adjudicated as such. An owner may acquire an animal that has been previously adjudicated to be a dangerous animal within the meaning of MCL 287.321(a) without any knowledge that the animal has been so adjudicated. And the additional requirement that the animal has been previously adjudicated to be a dangerous animal is consistent with a scheme that imposes some level of knowledge before criminal liability can attach; that is, the Legislature might reasonably have determined that an owner's knowledge that an animal has bitten or attacked someone in the past—without a specific adjudication of dangerousness—is sufficient by itself to warrant the imposition of criminal liability when the animal subsequently injures or kills another, see MCL 287.323(1) and (2), but that a higher showing is neces-

sary to impose criminal liability for lesser injuries or for allowing such an animal to run at large.

For similar reasons, we also do not agree that the Legislature's decision to include exceptions to the general definition of a dangerous animal shows that it intended to dispense with a criminal-intent element. As we have already explained, the Legislature's decision to limit an owner's liability to situations in which an animal "that meets" the definition of a dangerous animal "attacks" a person means that the prosecution must prove, in relevant part, that the animal has previously bitten or attacked a person. MCL 287.323(2); MCL 287.321(a). The definition of a dangerous animal is quite broad and could subject an owner to liability for any harm subsequently caused by his or her animal even when the prior incident was not representative of the animal's dangerous propensities. The Legislature decided to exclude some animals from the definition even though the animal may have previously bitten or attacked a person. The Legislature determined that an animal should not be deemed a dangerous animal if it bit or attacked a trespasser, if the animal bit or attacked a person who provoked or tormented it, or if the animal was responding to protect a person. MCL 287.321(a)(*i*) through (*iii*). The Legislature also determined that the definition should not apply to livestock. MCL 287.321(a)(*iv*).

These exclusions are consistent with a legislative intent to impose a criminal-intent element premised on the owner's knowledge that the animal meets the definition of a dangerous animal. The Legislature could reasonably have concluded that an owner who is aware that his or her animal bit or attacked a person in the past, but who knows that the bite or attack occurred under unique circumstances not indicative of a danger-

ous propensity, is not on notice that the animal presents a higher degree of danger to the public at large. Therefore, it could reasonably have believed that such an owner should not be held criminally liable for any future harm caused by that animal. In contrast, an owner who knows that his or her animal has bitten or attacked a person in the past and did so under circumstances that did not exclude the animal from the definition provided under MCL 287.321(a) is on notice that his or her animal poses a danger to the public and, accordingly, the Legislature could reasonably have concluded that the owner should be held criminally liable for any future harm that the animal causes.

### 3. GROSS NEGLIGENCE

Although we agree that MCL 287.323(2) includes a criminal-intent element, we do not agree with the circuit court's decision to impose a negligence standard. We also disagree with Janes's contention on appeal that the prosecution must prove that his gross negligence caused the injuries at issue. We acknowledge that this Court has previously held that, in order to establish a violation of MCL 287.323(1), the prosecution must prove that the defendant's gross negligence in handling the animal caused the victim's death. See *People v Trotter*, 209 Mich App 244; 530 NW2d 516 (1995). However, the Court in *Trotter* premised its holding on the Legislature's decision to state that a person who violated that section was guilty of involuntary manslaughter, which was a common-law offense with a criminal-intent element. *Id.* at 248-249.

In contrast to that section, none of the remaining sections of 1988 PA 426 refer—impliedly or otherwise—to negligent conduct. Rather, the primary focus in the remaining sections is on the defendant's status as the owner

of an animal that meets the definition of a dangerous
animal under MCL 287.321(a) and causes the speci-
fied injuries or engages in the proscribed behavior.
See MCL 287.323(2) through (4). Although it is clear
that the Legislature's purpose in enacting these
sections was to prevent the harms identified in the
statute (i.e., to prevent dangerous animals from run-
ning at large or injuring persons), it is equally clear
that it sought to discourage these harms by placing
owners on notice that they will be held criminally
liable for any harms caused by their dangerous ani-
mals. Stated another way, it is evident to us that the
Legislature sought to curtail the *ownership* of dan-
gerous animals and not the negligent *keeping* or
*handling* of dangerous animals. Consequently, we
believe the most natural reading of this statutory
scheme is to impose liability on owners who *know-*
*ingly* keep a dangerous animal that causes the speci-
fied harm and to do so without regard to the reason-
ableness of the owner's conduct.

### III. CONCLUSION

The circuit court did not err when it determined that
the Legislature's silence with respect to criminal intent
required under MCL 287.323(2) did not render that
offense a strict-liability crime. Michigan courts must
infer a criminal intent for every offense in the absence
of an express or implied Legislative intent to dispense
with criminal intent. Because there is no indication that
the Legislature intended to make MCL 287.323(2) a
strict-liability offense, we infer that the Legislature
intended to require the prosecution to prove criminal
intent. We further conclude that having the requisite
intent is proof that the owner knew that his or her
animal met the definition of a dangerous animal under

MCL 287.321(a). For these reasons, we hold that the prosecution must prove the following elements beyond a reasonable doubt in order to convict Janes under MCL 287.323(2): (1) that Janes owned or harbored a dog or other animal, (2) that the dog or other animal met the definition of a dangerous animal provided under MCL 287.321(a) before and throughout the incident at issue, (3) that he knew that the dog or other animal met the definition of a dangerous animal within the meaning of MCL 287.321(a) before the incident at issue, and (4) that the animal attacked a person and caused a serious injury other than death.

Affirmed and remanded for further proceedings consistent with this opinion. We do not retain jurisdiction.

BORRELLO, P.J., concurred with M. J. KELLY, J.

JANSEN, J. (*dissenting*). In my opinion, the Michigan Legislature intended to make the criminal offense set forth in § 3(2) of the dangerous animals act, MCL 287.323(2), a strict-liability crime. Therefore, I respectfully dissent.

Section 3(2) of the dangerous animals act, MCL 287.323(2), provides:

> If an animal that meets the definition of a dangerous animal in [MCL 287.321(a)] attacks a person and causes serious injury other than death, the owner of the animal is guilty of a felony, punishable by imprisonment for not more than 4 years, a fine of not less than $2,000.00, or community service work for not less than 500 hours, or any combination of these penalties.

In turn, § 1(a) of the dangerous animals act, MCL 287.321(a), provides:

> "Dangerous animal" means a dog or other animal that bites or attacks a person, or a dog that bites or attacks and

causes serious injury or death to another dog while the
other dog is on the property or under the control of its
owner. However, a dangerous animal does not include any
of the following:

(*i*) An animal that bites or attacks a person who is
knowingly trespassing on the property of the animal's
owner.

(*ii*) An animal that bites or attacks a person who
provokes or torments the animal.

(*iii*) An animal that is responding in a manner that an
ordinary and reasonable person would conclude was de-
signed to protect a person if that person is engaged in a
lawful activity or is the subject of an assault.

(*iv*) Livestock.

The use of the present tense in § 1(a) suggests that
an animal can meet the definition of a "dangerous
animal" the very first time it "bites or attacks" a person
or another dog. Noticeably absent from § 1(a) is any
indication that, in order to meet the definition of a
"dangerous animal," an animal must have a known
propensity for dangerousness. Nor does § 1(a) require
that the animal has previously bitten or attacked a
person or another dog. Accordingly, it is clear that an
animal may constitute a "dangerous animal" within the
meaning of § 1(a) the very first time it bites or attacks
a person or another dog.

Similarly, § 3(2) does not require that the owner of
the animal know of the animal's propensity for danger-
ousness. The only elements enumerated in § 3(2) are (1)
that the animal "meets the definition of a dangerous
animal" and (2) that the animal "attacks a person and
causes serious injury other than death." MCL
287.323(2).

I fully acknowledge that "where [a] criminal statute
is a codification of the common law, and where mens rea

was a necessary element of the crime at common law,"
courts generally "will not interpret the statute as
dispensing with knowledge as a necessary element."
*People v Quinn*, 440 Mich 178, 185-186; 487 NW2d 194
(1992); see also *Morissette v United States*, 342 US 246,
250-251; 72 S Ct 240; 96 L Ed 288 (1952). But unlike
§ 3(1) of the dangerous animals act, MCL 287.323(1),
which specifically refers to MCL 750.321, which in turn
codifies the prohibition against the common-law of-
fenses of voluntary and involuntary manslaughter, see
*People v Trotter*, 209 Mich App 244, 248-249; 530 NW2d
516 (1995), § 3(2) of the dangerous animals act is not a
codification of the common law. "[W]here the offense in
question *does not* codify a common-law offense and the
statute omits the element of knowledge or intent," this
Court must examine "the intent of the Legislature to
determine whether it intended that knowledge be
proven as an element of the offense, or whether it
intended to hold the offender liable regardless of what
he knew or did not know." *Quinn*, 440 Mich at 186
(emphasis added).

It is well established that, pursuant to the state's
general police power, the Legislature may enact crimi-
nal statutes that punish certain conduct irrespective of
the actor's intent, knowledge, or state of mind. *Id.* at
186-187; see also *Shevlin-Carpenter Co v Minnesota*,
218 US 57, 69-70; 30 S Ct 663; 54 L Ed 930 (1910).
Especially in the context of public-welfare legislation,
the Legislature may choose "to protect those who are
otherwise unable to protect themselves by placing 'the
burden of acting at hazard upon a person otherwise
innocent but standing in responsible relation to a public
danger.' " *Quinn*, 440 Mich at 187, quoting *United
States v Dotterweich*, 320 US 277, 281; 64 S Ct 134; 88
L Ed 48 (1943). I conclude that § 3(2) is just such a
public-welfare statute and that the criminal offense set

forth therein contains no scienter requirement because the Legislature intended to shift "the burden of acting at hazard" to those who own and possess animals in this state. See *Dotterweich*, 320 US at 281.

I find support for this conclusion in the legislative history of the dangerous animals act. I recognize that legislative bill analyses "are 'generally unpersuasive tool[s] of statutory construction' " and "do not necessarily represent the views of any individual legislator." *Kinder Morgan Mich, LLC v City of Jackson*, 277 Mich App 159, 170; 744 NW2d 184 (2007) (citation omitted; alteration in original). But "legislative bill analyses do have probative value in certain, limited circumstances." *Id.*

The dangerous animals act was added by way of 1988 PA 426, effective March 30, 1989. 1988 PA 426 was originally introduced as House Bill 4897 and went through several minor revisions before it was ultimately enacted by the Legislature. As indicated in the final legislative bill analysis of HB 4897, one of the arguments in favor of the bill was that it "would provide stiff penalties for irresponsible pet owners who endangered others by their failure to properly train or restrain their pets. Such penalties would encourage owners to take their responsibilities seriously . . . ." House Legislative Analysis, HB 4897 (as enrolled), January 20, 1989. This language further supports my conclusion that, in enacting § 3(2), the Legislature intended to shift the burden of acting to pet owners in an effort "to protect those who are otherwise unable to protect themselves," *Quinn*, 440 Mich at 187, irrespective of any particular pet owner's knowledge or state of mind.

I conclude that the offense set forth in § 3(2) of the dangerous animals act is a strict-liability crime, containing no scienter requirement. Accordingly, I would

affirm the circuit court's denial of defendant's motion
to quash, but reverse the circuit court's warning to the
prosecution that it will have to prove defendant's crimi-
nal intent at trial.