*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

JEFFREY FRANKS, MICHAEL WILLIAM
FRANKS, as the Successor Trustee of the
FRANKS FAMILY TRUST, and WILLIS
FRANKS,

          Plaintiffs-Appellees,

v

NEWELL A. FRANKS II, BRIAN
MCCONNELL, LEEAN MCCONNELL, also
known as LEEANN MCCONNELL, also known
as LEANN MCCONNELL, DAVID FRANKS,
LAWRENCE FRANKS, and BURR OAK TOOL,
INC.,

          Defendants-Appellants.

FOR PUBLICATION
September 24, 2019
9:15 a.m.

No. 343290
St. Joseph Circuit Court
LC No. 2013-000809-CB

Before: K. F. KELLY, P.J., and FORT HOOD and REDFORD, JJ.

PER CURIAM.

In this shareholders' dispute, defendants, Newell A. Franks II, Brian McConnell, LeeAnn McConnell, David Franks, Lawrence Franks, and Burr Oak Tool, Inc., appeal by right the trial court's order entered following its granting of summary disposition in favor of plaintiffs, Jeffrey Franks, the Franks Family Trust,[1] and Willis Franks. Defendants also challenge the trial court's order compelling Burr Oak to purchase plaintiffs' shares in Burr Oak. We reverse and remand for proceedings consistent with this opinion.

## I. BASIC FACTS

---

[1] The Franks Family Trust was substituted for Richard Franks after he died during the course of the litigation in the lower court.

The late Newell A. Franks founded Burr Oak in 1944. Burr Oak manufactures and sells machine tools in the heat transfer industry. It is located in Sturgis, Michigan. The parties to this case are all related to Newell A. Franks in some way. Newell A. Franks was the father of defendant Lawrence Franks, former plaintiff Richard Franks, and Tom Franks, who was deceased by the time of this litigation. Lawrence Franks is the father of defendant Newell A. Franks II, defendant David Franks, and defendant LeeAnn McConnell. LeeAnn McConnell is married to defendant, Brian McConnell. Tom Franks was the father of plaintiffs Jeffrey Franks and Willis Franks.

Defendants own voting shares—Class A shares—of Burr Oak or have an active role in the management of the corporation, as noted by Burr Oak's then accountant, Bruce Gosling. Newell A. Franks II is the Chief Executive officer and the Chairman of the Board of Directors. Plaintiffs each own Class B or C shares in the corporation, which are nonvoting shares. Class B shares do not get dividends, but Class B shares can be converted into Class C shares, which do get dividends. Plaintiffs have no role in the management of the corporation.

Historically, Burr Oak distributed dividends to its shareholders: Burr Oak issued dividends every year from 1950 to 2004 with the exception of five years. In 2001, for example, Burr Oak distributed $23 per share to holders of Class A stock and $45 per share to holders of Class C stock. Burr Oak paid out about $2.2 million to shareholders in 2002, and paid out $2,288,000 in 2003. It distributed another $2.2 million to shareholders in 2004. However, Burr Oak ceased paying dividends after the death of Newell A. Franks in 2007. Newell A. Franks II testified that Burr Oak stopped paying dividends because the company incurred a "tremendous outflow of cash" related to his grandfather's estate. He stated that the company had no formal policy for determining when to make a dividend distribution. Previously, his grandfather would just make the decision and it would be carried out.

Newell A. Franks II agreed that he had Gosling calculate the value of Burr Oak in 2012 in anticipation of a stock buyback. He agreed that Gosling's report, which was dated May 21, 2012, valued the company at $46,125,355, or at approximately $598 per share for the 77,043 shares of outstanding stock. Gosling testified that Newell A. Franks II asked him to prepare the valuation to help with a proposed buyout of the "minority shareholders." Newell A. Franks II stated that Burr Oak had more than $20 million in cash in May 2012. He indicated that it was not all available for the payment of dividends, but agreed that some could have been used to pay dividends. He also testified that Burr Oak loaned $1 million to Sturgis Bank in 2012, and he conceded that David Franks served on the board of directors for the bank. David Franks testified that he was a voting shareholder of the bank.

Six months after Gosling's valuation, defendants had Burr Oak offer to purchase defendants' shares for $62 per share. Newell A. Franks II conceded that there was no valuation to support that offer. He further acknowledged that Gosling wrote him and stated that his offer was "a good plan" because the nonvoting members were astute enough to realize that their shares had no value unless a different buyer were to offer them more. Gosling said that he told Newell A. Franks II that because, "if no dividends are being paid and there are no redemptions being made, then nobody else is going to buy the stock." He explained that Burr Oak was probably the only market for the shares and, if one cannot convert the stock certificate into cash in some way, it has no value. David Franks similarly testified that he knew that the $62 offer did not have any

support, but he agreed to move to make the offer on the understanding that it would get the conversation started. He also testified that he did not expect anyone to accept that offer. Newell A. Franks II admitted that no one accepted the offer of $62 per share. He also admitted that there was no valuation to support it. He, however, opined that $62 per share was a fair return given that plaintiffs paid zero dollars for their shares.

E-mail communications between David Franks and Brian McConnell suggested that the $62 per share offer to the "outside stock holders" was not made in good faith. David Franks wrote that the justification for the offer that Brian McConnell proposed to provide to Jeffrey Franks after Jeffrey Franks questioned the basis of the offer should not mention a related company—Oak Press Solutions, Inc.—because they had taken measures to ensure that that entity paid a fair price and he did not want to "plant a bug" about that company, which itself did not have the same "ownership concerns." Notably, plaintiffs had alleged that defendants caused Burr Oak to conduct business through related entities such as Oak Press Solutions to receive undisclosed distributions. Newell A. Franks II also admitted that his grandfather had in the past paid dividends of $62 per share in a single year. At a February 2013 meeting of the board of directors, the directors agreed to offer plaintiffs $141.26 per share. In September 2013, Burr Oak offered to buy shares at $248 per share. Defendants did not, however, accept any of these offers.

In September 2013, Jeffrey Franks, Richard Franks, and Willis Franks sued defendants. They alleged that Lawrence Franks, David Franks, Newell A. Franks II, Brian McConnell, and LeeAnn McConnell used their control of Burr Oak to benefit themselves and their families at the expense of the minority shareholders. They asserted that the identified conduct amounted to illegal, fraudulent, willfully unfair, and oppressive conduct in violation of MCL 450.1489. They asked the trial court to remedy the oppression by, among other possible remedies, ordering defendants to purchase plaintiffs' shares at fair value. They also alleged a claim of breach of fiduciary duty and a claim for an accounting. Plaintiffs filed an amended complaint in October 2013. They alleged seven claims in the amended complaint: shareholder oppression under MCL 450.1489, breach of fiduciary duties, accounting, fraud, constructive fraud, breach of contract, and aiding and abetting the scheme to deprive plaintiffs of their interests as shareholders.

On June 16, 2014, plaintiffs filed a motion with the trial court asking it to order Burr Oak to issue a dividend. In that same month, defendants moved for summary disposition of plaintiffs' claims under MCR 2.116(C)(8) and (C)(10). Defendants argued that the trial court had to dismiss the shareholder oppression claim because the conduct at issue did not establish a question of fact as to whether there was shareholder oppression. Specifically, they maintained that the failure to purchase stock was not by itself oppressive conduct; and, similarly, an offer to purchase stock at a particular price was also not oppressive. Moreover, they stated, defendants eventually offered to purchase plaintiffs' shares at $248 per share, which was the same price earlier offered to Lawrence Franks for his shares. Finally, they argued and presented evidence that the Board of Directors elected not to issue dividends for legitimate business reasons, which were protected under the business judgment rule. Namely, they maintained that Burr Oak had to retain its profits for capital improvements, to retire debt, and possibly redeem stock. Defendants relied in part on Brian McConnell's affidavit. Brian McConnell averred that he was Burr Oak's Chief Operating Officer and stated that Burr Oak had to pay out more than $15 million from 2007 to 2012 to cover obligations under Newell A. Franks' estate plan. He also stated that the Board of Directors felt that Burr Oak needed to establish an ambitious expansion plan to remain

competitive. Defendants also argued that the failure to pay dividends affected all the shareholders equally and so could not be oppressive to plaintiffs. In short, they maintained that there was no evidence that the board's exercise of business judgment was feigned or a mere subterfuge. As pertinent to this appeal, defendants also argued that plaintiffs failed to state a claim against LeeAnn McConnell because she was not a director of Burr Oak and did not participate in any of the decisions at issue.

On June 30, 2014, plaintiffs moved for partial summary disposition on their claim of shareholder oppression. Plaintiffs maintained that the undisputed evidence showed that defendants tried to implement an unfair stock redemption plan and wrongfully withheld the payment of dividends for the purpose of squeezing the nonvoting stock holders out of the corporation. They argued that the wrongful conduct established as a matter of law that defendants engaged in shareholder oppression. They further stated that defendants' admission that they had an obligation to buy the minority shareholders shares at fair value, which did not include discounts for marketability or lack of control, established that the trial court had to order a buyout at fair value with no discounts.

Defendants argued in opposition to plaintiffs' motion for partial summary disposition that the evidence showed that, at the very least, whether defendants acted with sound business judgment when they elected not to distribute dividends was a contested matter. They also maintained that whether Burr Oak had sufficient reserves to pay dividends was a contested matter. They supported their position with another affidavit by Brian McConnell in which he made averments concerning the financial condition of Burr Oak during 2012 and 2013 and its ability to pay dividends.

Plaintiffs filed a brief in opposition to defendants' motion for summary disposition and moving for summary disposition of their claim for shareholder oppression under MCR 2.116(I) on July 21, 2014. In part, plaintiffs argued and presented evidence that LeeAnn McConnell, contrary to her affidavit, did play a significant role in the management of Burr Oak as part of the controlling family faction. As for the claim that defendants had not engaged in any oppressive conduct, plaintiffs argued that the evidence showed that defendants implemented an aggressive stock redemption program in which they offered an unfair price after deliberately manipulating and misrepresenting the fair value of the stock. They made the offer after wrongfully withholding dividends in order to bully the minority shareholders into accepting a suppressed value. Plaintiffs presented evidence that the obligations that Burr Oak had arising from Newell A. Franks's estate ended in mid-2012, and that Burr Oak had significant cash reserves with which to both expand its operations and pay a significant dividend. This evidence, they maintained, showed that defendants were not in fact withholding dividends for a legitimate reason.

The trial court held a hearing on the various motions that were before it on December 1, 2014. The trial court started the hearing by stating that it would deny defendants' motion for summary disposition because there were "issues that do suggest that there was infringement of the minority shareholders." It went on, however, and stated that it found "infringement of the minority shareholders' rights." The trial court indicated that it was unsure what the remedy should be and stated that it wanted input from an independent expert to determine how to remedy the situation. The trial court stated that it wanted the parties to agree on an expert but said that it

would appoint one if they could not agree. The trial court also said that it would thereafter set a date for a two-day hearing to address the remedy. When asked to clarify its ruling, the trial court indicated that it was not granting plaintiffs' motion "just yet" on the issue of liability. But it also stated that it was not sure whether there were issues of material fact on plaintiffs' motion for partial summary disposition. On December 3, 2014, the trial court entered an order denying defendants' motion for summary disposition and reserving its ruling on the remaining motion. As pertinent to this appeal, the court subsequently instructed the parties to brief an appropriate remedy for shareholder oppression and indicated that it did not think that dissolution was a proper remedy.

As pertinent to this appeal, the trial court subsequently held a hearing on October 21, 2016 to consider plaintiffs' original motion for partial summary disposition. The trial court surveyed the evidence indicating that the controlling shareholders were not in fact dealing fairly with the nonvoting shareholders. On the basis of that evidence, it then found "that there has been suppression of the minority shareholder[s]." For that reason, the trial court stated, it would grant plaintiffs' motion for summary disposition. The trial court determined that the appropriate remedy was to compel the corporation to buy the nonvoting members' shares at a price to be determined after an evidentiary hearing. Defendants moved for reconsideration in November 2016. As they had throughout the pendency of the lower court proceedings, defendants stated their belief that the trial court could not find oppression and select a remedy without holding an evidentiary hearing. The trial court denied the motion for reconsideration in January 2017.

A trial on the issue of plaintiffs' remedy was held on May 2, 2017. Plaintiffs' expert certified public accountant, Thomas Frazee, testified generally about his valuation of Burr Oak. He opined that plaintiffs' shares in Burr Oak were worth $26,826,736. After Frazee testified, plaintiffs rested and defendants moved for a directed verdict. They argued that Frazee's testimony and report were insufficient to establish the value of plaintiffs' shares because he did not discount the value for marketability. The trial court denied the motion. Brian McConnell testified for the defense and stated that he had worked for Burr Oak for 26 years. He was Burr Oak's President and Chief Operating Officer. He stated that the three classes of stock came into being because Newell A. Franks wanted to create different classes to transfer as gifts for dividend purposes. The individuals who owned the voting shares ended up purchasing those shares whereas the other classes were all gifts. Although they often referred to the nonvoting shareholders as the "minority shareholders," the holders of the Class B and C shares actually owned 52% of the company. Newell A. Franks established the Class B and C shares in the 1980s so that he could pay dividends to those whom he gifted Class C shares without paying himself a dividend as the owner of the Class B shares.

Brian McConnell stated that, in 2006, before he died in 2007, Newell A. Franks sold his voting shares for $280 per share. The highest price ever requested for shares of Burr Oak was $356.22 per share, which was substantially less than the $712 per share calculated by Frazee. Brian opined that the company was not worth $50 million. He stated his belief that Burr Oak would be vulnerable if it became highly leveraged. The trial court, however, precluded him from testifying about the debt load that Burr Oak might be able to carry. Michael Oliphant testified on behalf of the defense as an expert certified public accountant. He opined that plaintiffs' shares were worth $398 per share. He, however, discounted the shares for marketability. The mathematical value based on the company's valuation would be $632 per share.

The trial court held a hearing to state its ruling on July 25, 2017. The trial court adopted plaintiffs' proposed findings of fact and found that plaintiffs' shares were worth $712 per share. The trial court specifically held that it could not apply a discount to lower the fair value of the shares. The trial court subsequently signed an order requiring Burr Oak to purchase plaintiffs' shares within two years for $712 per share. The trial court's order provided that Burr Oak would pay equitable interest and plaintiffs' attorney fees as well. The trial court entered a stipulated order dismissing plaintiffs' remaining claims without prejudice on December 28, 2017. It further provided that its order requiring redemption would be stayed pending defendants' appeal. The trial court entered an order dismissing plaintiffs' remaining claims with prejudice on March 27, 2018. Defendants now appeal as of right.

## II. ANALYSIS

We review de novo a trial court's decision on a motion for summary disposition. *Barnard Mfg Co, Inc v Gates Performance Engineering, Inc*, 285 Mich App 362, 369; 775 NW2d 618 (2009).

> A motion under MCR 2.116(C)(10) tests the factual sufficiency of the complaint. In evaluating a motion for summary disposition brought under this subsection, a trial court considers affidavits, pleadings, depositions, admissions, and other evidence submitted by the parties, MCR 2.116(G)(5), in the light most favorable to the party opposing the motion. Where the proffered evidence fails to establish a genuine issue regarding any material fact, the moving party is entitled to judgment as a matter of law. MCR 2.116(C)(10), (G)(4). *Quinto v Cross & Peters Co*, 451 Mich 358; 547 NW2d 314 (1996). [*Maiden v Rozwood*, 461 Mich 109, 120; 597 NW2d 817 (1999).]

In considering a motion for summary disposition, the trial court is not permitted to "weigh the evidence or make determinations of credibility[.]" *Innovative Adult Foster Care, Inc v Ragin*, 285 Mich App 466, 480; 776 NW2d 398 (2009). When opposing a properly supported motion for summary disposition under MCR 2.116(C)(10), the nonmoving party cannot rely on mere allegations or denials in his or her pleadings to establish a question of fact. *Quinto*, 451 Mich at 362. Rather, the nonmoving party must present evidence that establishes that there is a genuine issue of disputed fact on the issue raised by the moving party. *Id*. "A genuine issue of material fact exists when the record, giving the benefit of reasonable doubt to the opposing party, leaves open an issue upon which reasonable minds might differ." *West v Gen Motors Corp*, 469 Mich 177, 183; 665 NW2d 468 (2003).

This Court reviews de novo whether the trial court properly interpreted and applied the relevant statutes and court rules. *Brecht v Hendry*, 297 Mich App 732, 736; 825 NW2d 110 (2012).

### A. THE CREDIBILITY EXCEPTION TO SUMMARY DISPOSITION

Defendants rely on the decision in *White v Taylor Distrib Co, Inc*, 275 Mich App 615; 739 NW2d 132 (2007), aff'd 482 Mich 136 (2008), and indirectly on the decision in *Vanguard Ins Co v Bolt*, 204 Mich App 271; 514 NW2d 525 (1994), for the proposition that a reviewing

court cannot grant summary disposition on a claim, such as the one stated under MCL 450.1489, when the claim involves motive or intent as an element. These decisions appear to state a rule that summary disposition cannot be granted when an essential element of the claim or defense involves motive or intent. The majority in *White*, for example, stated that the grant of summary disposition is " 'especially suspect where motive and intent are at issue or where a witness or deponent's credibility is crucial.' " *White*, 275 Mich App at 625, quoting *Vanguard*, 204 Mich App at 276. However, if those statements are accepted at face value, summary disposition would rarely be appropriate because one could almost always argue that a finder of fact might disbelieve a witness's testimony involving an essential element of a claim or defense. A review of the authorities, however, shows that Michigan does not apply a rule precluding summary disposition whenever a claim or defense involves an individual's motive or intent.

The majority of the decisions citing a credibility exception to the grant of summary disposition, such as the one described in *White*, trace their origin to the plurality opinion by Justice SOURIS in *Durant v Stahlin*, 375 Mich 628; 135 NW2d 392 (1965). See, e.g., *White*, 275 Mich App at 625, citing *Vanguard*, 204 Mich App at 276, citing *Metro Life Ins Co v Reist*, 167 Mich App 112, 121; 421 NW2d 592 (1988), citing *Brown v Pointer*, 390 Mich 346, 354; 212 NW2d 201 (1973), citing *Durant*, 375 Mich at 647-648. In *Durant*, a Republican politician, Richard Durant, sued several other Republicans, including Richard Van Dusen, Arthur Elliott, and George Romney, for allegedly trying to prevent his re-election through improper methods, including a conspiracy that led to libel against him. *Id.* at 634-635 (opinion by ADAMS, J.). Durant produced proofs showing that a letter was published in newspapers with the signature of John H. Stahlin, which accused Durant of being the leader of an extremist group that resorted to bribery and threats of physical violence, among other things. *Id.* at 636. Van Dusen, Elliott, and Romney moved for summary disposition under the prior court rules and supported their motions with their own affidavits. *Id.* at 636-637. In their affidavits, they denied knowing about or participating in the creation and publication of the letter. *Id.* at 637. The trial court agreed that Durant's claims against these three defendants must be dismissed. *Id.* at 634.

Writing for three justices, Justice ADAMS stated that Durant failed to present any admissible evidence "by deposition, affidavit, or otherwise" from which "it could be found that the defendants participated in any way in the preparation or publication of [the letter] or in the purported conspiracy surrounding its preparation and publication." *Id.* at 638-639. Because Durant failed to present any admissible evidence to rebut the movants' affidavits, Justice ADAMS concluded, the trial court properly dismissed Durant's claims against those defendants under then GCR 1963, 117.3. *Durant*, 375 Mich at 640.

Justice SOURIS, who wrote for three Justices as well, agreed that the trial court's decision to dismiss was proper, but wrote separately to explain that summary disposition under such circumstances should be rare. *Id.* at 640-658 (opinion by SOURIS, J.). Justice SOURIS wrote that he was concerned by a "disturbing misapprehension among members of the bench and bar concerning the propriety of peremptory disposition of cases by summary judgment prior to trial as provided by our recently adopted rule, GCR 1963, 117." *Id.* at 642. This procedure, he cautioned, "strikes at the very heart of a litigant's right to determination of his legal dispute in an adversary judicial proceeding . . . ." *Id.* at 644. It, for that reason, should be put to "very limited use[.]" *Id.* Relying on federal authorities, including Judge Frank's opinion in *Arnstein v Porter*, 154 F2d 464 (CA 2, 1946), Justice SOURIS agreed that summary judgment would be

inappropriate in cases where, "notwithstanding the opposing party's failure to attempt even to discredit the honesty of [an] affiant by counter-affidavits or other proofs," the affiant's credibility is "crucial to decision of a disputed fact issue." *Durant*, 375 Mich at 647-648. This was especially true, he stated, for matters that are "peculiarly within the defendant's knowledge." *Id.* at 648, quoting *Arnstein*, 154 F2d at 469, 471.

Turning to the motion at issue, Justice SOURIS recognized that Van Dusen, Elliott, and Romney did not challenge the fact of the libel, but instead challenged Durant's ability to establish their participation in the libel. *Durant*, 375 Mich at 655 (opinion by SOURIS, J). Durant, however, did not respond to the motion with any admissible evidence "from the depositions taken or from any other source to establish that if permitted to go to trial there would be any genuine issue of material fact to be decided by a jury or by the judge trying the case without a jury." *Id.* at 658. For that reason, Justice SOURIS agreed that the trial court properly granted the motion for summary disposition. *Id.*

Since the decision in *Durant*, courts have slowly, but steadily moved away from the notion that summary disposition should be disfavored. In Federal Practice and Procedure, for example, the authors identify Judge Frank of the Second Circuit, whose views Justice Souris approved in *Durant*, as "the principal proponent of a very strict approach to summary judgment," and state that he "usually was able to find an issue of credibility lurking in the cases brought before that court." See 10A Wright, Miller, & Kane, Fed Practice & Procedure, 4th ed., § 2726, p 443. Judge Frank's application of the exception was, in the authors' view, extreme: "The effect of the approach adopted by Judge Frank in these cases would be to deny summary judgment whenever the motion depended on facts presented by affidavit—a restriction that would cripple the summary judgment procedure." *Id.* at 444. None of the circuits have adopted Judge Frank's position; instead, the general rule is "that specific facts must be produced in order to put credibility in issue so as to preclude summary judgment." *Id.* at 444-445. In modern federal practice, the nonmoving party may not rely on the fact that a jury might disbelieve a witness's testimony to establish a question of fact that precludes summary disposition. See *Anderson v Liberty Lobby, Inc*, 477 US 242, 256; 106 S Ct 2505; 91 L Ed 2d 202 (1986) (rejecting the respondents' contention that summary judgment is inappropriate whenever state of mind is at issue). The same is true in Michigan.

Michigan courts were formerly required to be "liberal" in finding that a genuine issue of material fact exists and only granted summary disposition when the court was convinced that it was *impossible* for the claim or defense to be supported at trial. *Rizzo v Kretschmer*, 389 Mich 363, 372; 207 NW2d 316 (1973). However, our Supreme Court has disavowed the continuing validity of that standard, *Smith v Globe Life Ins Co*, 460 Mich 446, 455 n 2; 597 NW2d 28 (1999), and it has further stated that a party may not avoid summary disposition by promising to produce evidence at trial, *Maiden*, 461 Mich at 121. Rather, the nonmoving party must identify evidence that puts the affiant's or deponent's credibility at issue to avoid summary disposition. See, e.g., *Debano-Griffin v Lake Co*, 493 Mich 167, 180-181; 828 NW2d 634 (2013) (stating that the plaintiff presented evidence that called into question a witness's credibility and, because the proffered justification for the act was established by that witness, there was an issue of fact for the finder of fact that precluded summary disposition); see also *White v Taylor Distrib Co, Inc*, 482 Mich 136, 142-143; 753 NW2d 591 (2008) (affirming this Court's decision because the

defendant's own statements were inconsistent, which put his credibility at issue on the question whether he experienced a sudden emergency).

To the extent that this Court's decisions seem to apply an absolute exception to the application of summary disposition premised on the mere possibility that a jury might disbelieve an essential witness, as first articulated in *Durant*, the application of such a rule is limited to those situations where the moving party relies on subjective matters that are exclusively within the knowledge of its own witness and where the witness would have the motivation to testify to a version of events that are favorable to the moving party. See *White*, 275 Mich App at 630. This is not such a case. As will be discussed in this opinion, plaintiffs presented evidence that, if left unrebutted, established that defendants engaged in shareholder oppression within the meaning of MCL 450.1489(1) and MCL 450.1489(3), and that they did so with the requisite intent. As such, the trial court could properly grant summary disposition on liability if defendants did not establish a question of fact on the issue of intent. The evidence also called into question whether defendants' proffered business reasons were merely pretexts for unlawful shareholder oppression.

## B. THE EQUITY EXCEPTION TO SUMMARY DISPOSITION

On appeal, defendants also assert that it was improper for the trial court to grant summary disposition in this case because it involved an equitable action. Our Supreme Court has stated that traditional equity actions do not lend themselves to summary disposition because actions in equity may involve numerous questions that must be determined by the trial court sitting in equity in order to shape a proper decree. *Sun Oil Co v Trent Auto Wash, Inc*, 379 Mich 182, 191; 150 NW2d 818 (1967). Notably, our Supreme Court did not state in *Sun Oil* that summary disposition was *never* appropriate in cases involving equity. Rather, it opined that summary disposition was inappropriate under the facts of that case. See *id*. The cause of action stated under MCL 450.1489(1) includes elements that can readily be tested in a motion for summary disposition using ordinary proofs, even if a court sitting in equity might need to take evidence to craft a proper decree. MCL 450.1489(1) and MCL 450.1489(3). Additionally, the decision in *Sun Oil* occurred before adoption of the current rules governing summary disposition, and our Supreme Court has since rejected prior practice, which disfavored summary disposition unless the trial court determined that it was impossible for a claim to be supported by evidence at trial. *Maiden*, 461 Mich at 120-121. Rather, the Court reiterated that summary disposition is appropriate unless the nonmoving party demonstrates that there are issues that must be decided by the finder of fact. *Id.* at 121 ("A reviewing court may not employ a standard citing the mere possibility that the claim might be supported by evidence produced at trial."). And this Court has determined that a trial court properly granted summary disposition in favor of a plaintiff on an equitable claim given that the material facts were not in dispute. See, e.g., *Johnson Family Ltd Partnership v White Pine Wireless, LLC*, 281 Mich App 364, 386; 761 NW2d 353 (2008) (affirming a trial court's decision to grant summary disposition in favor of the plaintiff in an action to reform a deed). Accordingly, if the material facts are undisputed, a trial court may be warranted in granting summary disposition on one or more elements of a claim under MCL 450.1489(1). MCR 2.116(C)(10).

## C. SHAREHOLDER OPPRESSION CLAIM: NATURE AND ELEMENTS

In this case, plaintiffs sued defendants—in relevant part—for taking acts in violation of MCL 450.1489, which is commonly referred to the "shareholder-oppression statute[.]" *Madugula v Taub*, 496 Mich 685, 697; 853 NW2d 75 (2014). In that statute, the Michigan Legislature provided a cause of action to redress certain wrongs by those in control of a closely held corporation when the acts interfere with a shareholder's property rights:

> A shareholder may bring an action in the circuit court of the county in which the principal place of business or registered office of the corporation is located to establish that the acts of the directors or those in control of the corporation are illegal, fraudulent, or willfully unfair and oppressive to the corporation or to the shareholder. [MCL 450.1489(1).]

In *Madugula*, our Supreme Court explained that the cause of action stated under MCL 450.1489 was similar to historical shareholder derivative claims against directors or those in control of a corporation to remedy fraud, illegality, abuses of trust, or other oppressive conduct. It also noted that the common law allowed an aggrieved shareholder to bring a claim for dissolution in a court of equity to remedy oppressive conduct. *Madugula*, 496 Mich at 707-711. The Court recognized that the Legislature enumerated remedies under the statute that were traditionally equitable and also did not limit the trial court's authority to grant relief to those enumerated remedies. Rather, the Legislature provided courts with broad authority to fashion an appropriate remedy, which, it stated, was consistent with practice under equity. *Id.* at 711-714. On the basis of these observations, the Court held that a claim under MCL 450.1489 sounded in equity and must be tried before a court sitting in equity. *Id.* at 714-715. Consequently, plaintiffs' claim under MCL 450.1489 was an equitable claim.

The Legislature expressed its intent to apply the shareholder-oppression statute to remedy harms against shareholders of closely held corporations whose shares were not readily marketable. See MCL 450.1489(2) (providing that the cause of action does not apply to a "shareholder whose shares are listed on a national securities exchange or regularly traded in a market maintained by 1 or more members of a national or affiliated securities association"). As this Court has recognized, the shareholders of a closely held corporation frequently expect to obtain pecuniary benefits from their shares by working for the corporation or participating in its management, rather than by selling the shares. *Franchino v Franchino*, 263 Mich App 172, 184; 687 NW2d 620 (2004). Notwithstanding that recognition, the Court in *Franchino* interpreted a prior version of MCL 450.1489(3) and concluded that the Legislature did not intend to protect shareholders from acts to terminate their employment or participation in the management of the closely held corporation:

> Michigan's statute neither explicitly protects minority shareholders' interests as employees or directors, nor is it silent on the issue. Rather, the Legislature amended the statute to explicitly state that minority shareholders could bring suit for oppression only for conduct that "substantially interferes with the interests of the shareholder as a *shareholder*." MCL 450.1489(3) (emphasis added). To construe the statute in a way that allows [the] plaintiff to sue for oppression of his interests as an employee and director would ignore the Legislature's decision to insert the phrase "as a shareholder" and render the phrase nugatory, which is contrary to a fundamental rule of statutory construction.

-10-

Accordingly, we hold that the trial court correctly concluded that MCL 450.1489(3) does not allow shareholders to recover for harm suffered in their capacity as employees or board members. [*Franchino*, 263 Mich App at 185-186 (some citations omitted).]

After the decision in *Franchino*, the Legislature amended MCL 450.1489(3) to specifically provide that willfully unfair and oppressive conduct could include termination of employment or other acts that disproportionately interfered with a shareholder's interests. See 2006 PA 68. MCL 450.1489(3) now provides:

As used in this section, "willfully unfair and oppressive conduct" means a continuing course of conduct or a significant action or series of actions that substantially interferes with the interests of the shareholder as a shareholder. Willfully unfair and oppressive conduct may include the termination of employment or limitations on employment benefits to the extent that the actions interfere with distributions or other shareholder interests disproportionately as to the affected shareholder. The term does not include conduct or actions that are permitted by an agreement, the articles of incorporation, the bylaws, or a consistently applied written corporate policy or procedure.

On appeal, plaintiffs challenge defendants' argument that MCL 450.1489 requires proof of intent. Plaintiffs acknowledge that the statute provides that plaintiffs must show that defendants engaged in "willfully unfair and oppressive" acts, but they disagree that the term "willfully" required proof that defendants subjectively intended their acts to be unfair and oppressive to plaintiffs as shareholders. Plaintiffs rely on the fact that the Legislature defined " 'willfully unfair and oppressive conduct' [to] mean[ ] a continuing course of conduct or a significant action or series of actions that substantially interferes with the interests of the shareholder as a shareholder." MCL 450.1489(3). More specifically, they note that the definition of "willfully unfair and oppressive conduct" stated under MCL 450.1489(3) does not include any particular intent. Plaintiffs contend that it does not matter whether defendants intended their actions to be unfair and oppressive to plaintiffs as shareholders. Because the statute does not require proof of intent, plaintiffs maintain that the trial court could properly grant summary disposition in their favor because the undisputed evidence showed that defendants took actions that substantially interfered with their interests as shareholders, and it is irrelevant whether defendants had a legitimate business reason for doing so.

Plaintiffs' preferred interpretation of the statute would transform the shareholder-oppression statute into a strict liability statute, which does not comport with the language used by the Legislature. In MCL 450.1489(1), the Legislature identified three classes of wrongful acts for which it wished to create a remedy: it created a remedy for "acts" that were "illegal, fraudulent, or willfully unfair and oppressive[.]" By grouping these terms together, the Legislature indicated that the terms were of the same class or character and had related meaning. *Atlantic Cas Ins Co v Gustafson*, 315 Mich App 533, 541; 891 NW2d 499 (2016) (recognizing that pursuant to the "interpretive canon" *noscitur a sociis*, "words grouped in a list should be given related meanings.") (Citation omitted.) Performing an illegal act ordinarily encompasses some malevolent intent. See *People v Janes*, 302 Mich App 34, 41-42; 836 NW2d 883 (2013) (observing that Michigan's common law requires that "every conviction for an offense required

proof that the defendant committed a criminal act (*actus reus*) with criminal intent (*mens rea*).”). Similarly, fraud encompasses a malevolent intent: it is “an intentional perversion or concealment of the truth for the purpose of inducing another in reliance upon it to part with some valuable thing or surrender a legal right.” *Barkau v Ruggirello*, 113 Mich App 642, 647; 318 NW2d 521 (1982).[2]  The Legislature’s decision to group “willfully unfair and oppressive” acts with acts that are illegal or fraudulent strongly suggests that the Legislature required proof of an intent to act in a manner that was unfair and oppressive to the shareholder.[3]  Additionally, the use of the term “willfully” reinforces this conclusion.  An act is willfully done when taken “with the intent to do something specific[,]” that is, the action is undertaken with “the specific intent to bring about the particular result the statute seeks to prohibit.” *In re Erwin*, 503 Mich 1, 10-11; 921 NW2d 308 (2018), mod 503 Mich 876 (2018) (citations omitted).  Because the statute refers to “acts” by the directors or persons in control that were—in relevant part—“willfully unfair and oppressive,” our reading of MCL 450.1489(1) leads us to conclude that the Legislature required proof that the directors or persons in control performed the “acts” and that those acts were done to bring about an unfair and oppressive result. *In re Erwin*, 503 Mich at 10-11.

The Legislature continued to refer to “ ‘willfully unfair and oppressive’ ” activities in MCL 450.1489(3), but it did not refer to “acts” that were “willfully unfair and oppressive”; instead, it defined “ ‘willfully unfair and oppressive conduct.’ ” MCL 450.1489(3).  The term conduct does not appear in MCL 450.1489(1).  This Court must assume that the Legislature used the term “conduct” rather than “acts” for a reason.  See, e.g., *Farrington v Total Petroleum, Inc*, 442 Mich 201, 210; 501 NW2d 76 (1993) (stating that courts cannot assume that the Legislature was mistaken when it omitted a term that it used in a different statute).  This Court must also read the statute as a harmonious whole.  See *Macomb Co Prosecuting Attorney v Murphy*, 464

---

[2] This Court is not required to follow the rule of law established by this Court in an opinion published before November 1, 1990.  MCR 7.215(J)(1).  However, this Court may rely on decisions published before November 1, 1990, as persuasive authority. *In re Stillwell Trust*, 299 Mich App 289, 299 n 1; 829 NW2d 353 (2012).

[3] In interpreting a similar statute that referred to “illegal, oppressive, or fraudulent” actions the Supreme Court of Texas held that, by grouping the term “oppressive” with illegal and fraudulent, the Legislature signified that the term “oppressive” should be construed to include acts that were at least as serious as illegal or fraudulent acts.  It also concluded that it could not construe the term in a way that ignored the director or manager’s fiduciary duty to exercise his or her business judgment for the benefit of the corporation rather than a sole shareholder.  From these considerations, it held that the term “oppressive” necessarily required proof that the director or manager acted with the intent to harm a shareholder’s interests. *Ritchie v Rupe*, 443 SW3d 856, 868-871 (Tex, 2014); cf. *Baur v Baur Farms, Inc*, 832 NW2d 663, 673-674 (Iowa, 2013) (interpreting the term “oppressive,” as used in a statute that applied to “illegal, oppressive, or fraudulent” acts, to mean that the act—without regard to intent—frustrated the minority shareholder’s reasonable expectations).  Although foreign authorities are not binding on this Court concerning an issue of state law, they may be persuasive. *Finazzo v Fire Equip Co*, 323 Mich App 620, 631; 918 NW2d 200 (2018).

Mich 149, 159; 627 NW2d 247 (2001) (noting that a statute must be read as a harmonious whole). The Legislature may have used the term "conduct" to define a category of acts, which, if done willfully—as otherwise required under MCL 450.1489(1)—would amount to a willfully unfair and oppressive act. See, e.g., *Estes v Idea Engineering & Fabrications, Inc*, 250 Mich App 270, 281; 649 NW2d 84 (2002) (stating that MCL 450.1489(1) provides a cause of action to remedy "acts" that amount to an "ongoing pattern of oppressive misconduct") (quotation marks and citation omitted).

If this Court were to treat the definition of "willfully unfair and oppressive conduct" provided under MCL 450.1489(3) as a substitute for the terms "acts" that "are . . . willfully unfair and oppressive" stated in MCL 450.1489(1), this Court would in effect read the term "willfully" out of MCL 450.1489(1). This Court must avoid a construction that renders part of the statute surplusage or nugatory. *Robinson v Lansing*, 486 Mich 1, 21; 782 NW2d 171 (2010). Because the Legislature grouped willfully unfair and oppressive with illegal and fraudulent, we cannot lightly adopt a construction that transforms the last category into a form of strict liability. Therefore, we hold that, with regard to acts that are willfully unfair and oppressive, the complaining shareholder must prove that the directors or persons in control of the corporation engaged in a "continuing course of conduct" or took "a significant action or series of actions" that substantially interfered with the interests of the shareholder as a shareholder, and that they did so with the intent to substantially interfere with the "interests of the shareholder as a shareholder." MCL 450.1489(1); MCL 450.1489(3). Thus, a defendant can avoid liability by showing that he or she did not have the requisite intent when he or she took the acts that interfered with the shareholder's interests. Consequently, we conclude that defendants could establish a question of fact on this element by proffering evidence from which a finder of fact could conclude that defendants' actions, though the actions may have substantially interfered with the shareholder's interests as a shareholder, were nevertheless done for a legitimate business reason and otherwise not done with the intent to harm the shareholder's interests as a shareholder.

Under this construction of the statutory scheme, to make out a claim of shareholder oppression in violation of MCL 450.1489(1), plaintiffs had to allege and be able to prove: (1) that they were shareholders of the corporation, (2) that defendants were "directors" or "in control of the corporation"; (3) that defendants engaged in acts; and (4) that those acts were "illegal, fraudulent, or willfully unfair and oppressive" to the corporation or to them as shareholders. See MCL 450.1489(1). To the extent that plaintiffs maintained that defendants' acts were willfully unfair and oppressive to them as shareholders, they had to be able to prove that the acts amounted to a "continuing course of conduct or a significant action or series of actions that substantially" interfered with their interests as shareholders and that defendants took those acts with the intent to interfere with their interests as shareholders. MCL 450.1489(3).

## D. THE BUSINESS JUDGMENT RULE

Defendants also argued before the trial court and continue to argue on appeal that their decision to retain cash and refrain from paying out dividends cannot serve as evidence of shareholder oppression because their decisions are protected by the business judgment rule. Our Supreme Court has explained that courts generally will not substitute their judgment for that of directors concerning dividend policies in the absence of evidence that the policy was fraudulent

or done in bad faith. *In re Butterfield Estate*, 418 Mich 241, 255; 341 NW2d 453 (1983). This is because courts are reluctant to intervene in the affairs of corporate bodies absent a clear showing of actual or impending wrong. *Reed v Burton*, 344 Mich 126, 130; 73 NW2d 333 (1955). Under the business judgment rule, courts will refrain from interfering in matters of business judgment and discretion unless the directors or officers "are guilty of willful abuse of their discretionary powers" or act in bad faith. *Id.* at 131 (citation and quotation marks omitted).

Here, plaintiffs did not ask the trial court to review the soundness of defendants' business decisions. Rather, they alleged and presented evidence that defendants' decisions were not taken for legitimate business reasons, but instead were taken to defraud or oppress plaintiffs' interests as shareholders. Under MCL 450.1489(1) and MCL 450.1489(3), the Legislature identified acts by directors or persons of a corporation that are inherently wrongful and would warrant court intervention. Accordingly, a shareholder necessarily overcomes the business judgment rule by presenting evidence to establish the elements of a claim under the shareholder-oppression statute because that statute identifies wrongful conduct and provides a remedy for it. *Reed*, 344 Mich at 130-131; see also *Wayne Co Prosecuting Attorney v Nat'l Mem Gardens*, 366 Mich 492, 496; 115 NW2d 312 (1962) (stating that the business judgment rule applies only "where there has been no fraud, misconduct, or abuse of discretion by the officers and directors."). Accordingly, the business judgment rule does not prohibit a court from evaluating defendants' business decisions—including their dividend policy—in light of the totality of the evidence to determine whether the evidence showed that defendants formulated their policy in bad faith and as part of a plan to commit acts amounting to shareholder oppression under MCL 450.1489(1). For this reason, we reject defendants' arguments that the trial court could not consider defendants' dividend policy, their failure to divulge Gosling's valuation, or the fairness of their $62 per share offer when considering whether defendants engaged in shareholder oppression.

E. SUMMARY DISPOSITION: LIABILITY

On appeal, defendants argue that the trial court erred in granting summary disposition in favor of plaintiffs because genuine issues of material fact existed with respect to whether defendants' alleged actions met the requirements of MCL 450.1489(1). We agree.

In their motion for summary disposition, plaintiffs asserted that the undisputed facts showed that defendants took acts that were illegal, fraudulent, or willfully unfair and oppressive within the meaning of MCL 450.1489(1), and that the appropriate remedy was to order redemption at fair value under MCL 450.1489(1)(e). It was undisputed that plaintiffs did not have any voting rights as shareholders of Burr Oak, were not employed by Burr Oak, were not directors, and had no role in the management of the corporation. As such, it was undisputed that plaintiffs' ability to derive pecuniary benefit from their shares depended on the acts of the voting shareholders who had exclusive control over Burr Oak. Plaintiffs presented evidence that Burr Oak had consistently paid dividends to the nonvoting shareholders throughout the years with the exception of the past few years after the death of Newell A. Franks. The evidence showed that plaintiffs had not been receiving the only benefit that ownership of their Class B and C shares had before the events at issue; namely, the payment of regular dividends.

Plaintiffs also presented evidence that permitted an inference that, by 2012, defendants had embarked on a plan to devalue plaintiffs' shares. Plaintiffs showed that Burr Oak was

financially sound and had completed a multi-year debt-reduction plan, which included the completion of the obligations arising from Newell A. Franks' estate. Plaintiffs cite a January 2012 e-mail by Newell A. Franks II in which he noted that Burr Oak had the resources to pay a $1.2 million dividend or repurchase Class B and C shares. The evidence nevertheless showed that, although Burr Oak could return to paying dividends, as was its historical practice, defendants caused Burr Oak to continue withholding the payment of dividends under circumstances that could be indicative of shareholder oppression.

Plaintiffs presented e-mail communications between David Franks, Newell A. Franks II, and Brian McConnell that showed that they had embarked on a plan to purchase the Class B and C shares in September 2011 and that they understood the value of those shares to be anywhere from approximately $250 per share to $332 per share. They also identified testimony by Newell A. Franks II in which he agreed that the board of directors intended to implement a program to buyout the shareholders in 2012. Plaintiffs presented an e-mail in which Newell A. Franks II wrote to David Franks and Brian McConnell and acknowledged that the nonvoting shares had a value of $352 per share, but stated that he suspected that certain shareholders might take less for "cash today." This e-mail permitted an inference that Newell A. Franks II understood that they might take advantage of the Class B and C shareholders' need for "cash today" to repurchase the shares at a discount.

Plaintiffs identified evidence that Gosling prepared an updated valuation for the redemption plan at the request of Newell A. Franks II and that he valued the shares at $356.22 with substantial discounts for marketability; if one did not apply any discounts, the approximate value would be $598 per share using Gosling's valuation of Burr Oak. Plaintiffs demonstrated that defendants did not disclose the revised valuation and then offered plaintiffs just $62 per share at a time when the Class B and C shareholders had received no dividends for years. They further cited e-mails between Brian McConnell, David Franks, and Newell A. Franks II that suggested that the $62 per share offer was not premised on any actual or reasonable valuation and that they wanted to conceal that fact from the Class B and C shareholders. They also cited Gosling's deposition testimony, in which he admitted that he sent Newell A. Franks II an e-mail informing him that the $62 per share offer was a good offer considering that the shares had no value if the board of directors was not issuing dividends and would not otherwise repurchase the shares, as evidence that defendants knew that their actions were devaluing the Class B and C shares and tried to take advantage of that fact. Plaintiffs further presented evidence that defendants made two additional offers to repurchase shares at increasingly higher values after plaintiffs balked at the offer of $62 per share. Notably, there was evidence that the shareholders had in the past received *annual* dividend payments that were on par with the one-time offer to purchase the shares at $62 per share; stated another way, defendants' offer of $62 per share was akin to an offer to pay one last dividend in exchange for plaintiffs' agreement to relinquish their ownership interests. Plaintiffs argued below this evidence suggested that the $62 per share offer was done in bad faith.

Taken together, this evidence established that defendants acted in concert to take acts that were willfully unfair and oppressive to plaintiffs as shareholders. MCL 450.1489(1) and MCL 450.1489(3). The evidence, if left rebutted, showed that plaintiffs could only realize value in their shares if Burr Oak issued dividends or purchased their shares. The evidence further established that Burr Oak had not been paying dividends for years, which left plaintiffs without

-15-

income from their shares for a substantial period. The evidence showed that defendants knew that the Class B and C shares had a substantial value when considered in light of Burr Oak's actual market value and historical dividend practices, but the evidence showed that they also understood that they could—in effect—devalue those shares by refusing to pay dividends. The evidence showed that defendants then made an extremely low offer to purchase the Class B and C shares, after obtaining a report that strongly suggested that the shares were worth hundreds of dollars more per share. In the absence of evidence to justify the $62 per share offer, or to establish a legitimate business reason for refusing to pay dividends despite the company's ability to pay and historical practices, the evidence cited by plaintiffs established that defendants collectively took acts that substantially interfered with plaintiffs' interests as shareholders—their right to receive reasonable dividend payments or sell their shares at a fair value—and that they did so with the intent to substantially interfere with those shareholder rights. As such, plaintiffs made a properly supported motion for summary disposition on the issue of liability under MCL 450.1489(1), and, for that reason, were entitled to summary disposition unless defendants responded and identified evidence that established that there was a question of fact on the issue of liability. See *Barnard Mfg*, 285 Mich App at 370.

In their own motion for summary disposition, defendants proffered evidence that Burr Oak had legitimate business reasons for withholding the payment of dividends. Defendants cited an affidavit by Brian McConnell in which he averred that Burr Oak was required to retire significant debt related to the estate of Newell A. Franks, which was the reason that Burr Oak had not paid dividends for several years. He further averred that, after the estate obligations were finally paid in 2012, the board determined that the best way to maximize the value of the shareholders' shares was to expand Burr Oak's facilities. Brian McConnell stated that Burr Oak had in the past missed delivery expectations and needed to expand to meet market expectations. For these reasons, he averred, the board decided not to pay dividends in order to retain cash to meet its needs even after the board paid its obligations related to Newell A. Franks's estate.

In their memorandum in opposition to plaintiffs' motion for partial summary disposition, defendants reasserted the business reasons stated in Brian McConnell's affidavit as evidence that defendants' actions were not fraudulent or willfully unfair and oppressive. They also supplemented his affidavit with a second affidavit. In his supplemental affidavit, Brian McConnell averred that Burr Oak made approximately $8.5 million in improvements after it met its obligations related to Newell A. Franks's estate. He also explained that Burr Oak net cash position was actually lower than its total cash on hand. He offered that Burr Oak's net cash position was actually in the negative as of June 2014. Defendants also presented evidence that they eventually offered to purchase plaintiffs' shares at $248 per share, which, they stated, was reasonably based on an earlier offer. They presented evidence that they eventually disclosed Gosling's valuation report to plaintiffs and asserted that plaintiffs had the information available to assess the value of their own shares. Defendants argued that the evidence showed that they did not take acts that were fraudulent or willfully unfair and oppressive. Instead, they made legitimate business decisions related to the operation of Burr Oak.

Defendants' evidence, if believed, would support a finding that defendants caused Burr Oak to hold its cash rather than pay dividends to its shareholders for legitimate business reasons and not with the intent to substantially interfere with plaintiffs' interests as shareholders. MCL 450.1489(3). Their evidence also permitted an inference that the board made the various offers

-16-

to purchase plaintiffs' shares as part of a legitimate bargaining tactic and not as an attempt to force plaintiffs to sell their shares at a severe discount under the pressure created by the failure to pay dividends. As such, defendants established a question of fact as to whether their acts were fraudulent or willfully unfair and oppressive within the meaning of MCL 450.1489(1) and MCL 450.1489(3). Because the trial court could not resolve questions of fact on a motion for summary disposition, *White*, 275 Mich App at 625, the trial court erred when it granted plaintiffs' motion for summary disposition.

## F. SUMMARY DISPOSITION: REMEDY

Defendants also argue on appeal that the trial court erred when it selected a remedy despite the fact that there were numerous questions of fact implicating the proper remedy. We agree.

The Legislature provided that a court hearing a shareholder oppression claim has broad authority to fashion a remedy for the shareholder oppression:

If the shareholder establishes grounds for relief, the circuit court may make an order or grant relief as it considers appropriate, including, without limitation, an order providing for any of the following:

(a) The dissolution and liquidation of the assets and business of the corporation.

(b) The cancellation or alteration of a provision contained in the articles of incorporation, an amendment of the articles of incorporation, or the bylaws of the corporation.

(c) The cancellation, alteration, or injunction against a resolution or other act of the corporation.

(d) The direction or prohibition of an act of the corporation or of shareholders, directors, officers, or other persons party to the action.

(e) The purchase at fair value of the shares of a shareholder, either by the corporation or by the officers, directors, or other shareholders responsible for the wrongful acts.

(f) An award of damages to the corporation or a shareholder. An action seeking an award of damages must be commenced within 3 years after the cause of action under this section has accrued, or within 2 years after the shareholder discovers or reasonably should have discovered the cause of action under this section, whichever occurs first. [MCL 450.1489(1).]

As our Supreme Court has recognized, the statute provides that a trial court may refuse to grant any relief, even though the shareholder might have established acts of shareholder oppression, if the equities warrant the refusal. See *Madulga*, 496 Mich at 711. As already noted, our Supreme Court has held that a claim of shareholder oppression sounds in equity. *Id*.

-17-

Defendants presented evidence that—if believed—would permit an inference that they chose to withhold dividends for legitimate business reasons. They also presented evidence that Burr Oak needed to make improvements to remain competitive. This evidence, even if this Court were to conclude that it did not establish a question of fact on the issue of liability, was evidence that implicated the potential for alternate relief. Additionally, defendants maintained that Burr Oak would not be able to purchase plaintiffs' shares at full value in the short term without harming the company. They further noted that the company employs hundreds of employees in the local community whose welfare could be impacted.

A drastic remedy, such as the forced purchase of the Class B and C shares at a price and over a term that threatens the viability of the business clearly implicates the interests of innocent third parties. We acknowledge that the trial court had broad discretion to fashion a remedy to fit the equities of the case. MCL 450.1489(1). However, it could have ordered the payment of dividends, could have converted the Class B and C shares into voting shares, could have ordered the appointment of a disinterested director or directors, or provided other relief necessary to correct and prevent oppressive conduct short of a forced purchase plan that might harm Burr Oak as a going concern. See, e.g., *Stott Realty Co v Orloff*, 262 Mich 375, 381; 247 NW 698 (1933) (recognizing the trial court's "ample power" to provide relief for "substantially all corporate ills."); MCL 450.1489(1). Even if the trial court determined that a forced purchase plan best served all the affected parties, it might have been persuaded by the evidence that the sale should be structured in a way that better preserved the integrity of Burr Oak as a going concern. In any event, given the conflicting evidence before the trial court, it could not decide as a matter of law what remedy best fit the equities of the case. As such, the trial court additionally erred by granting summary disposition on the remedy because the record had not been developed sufficiently to permit the court to select an appropriate remedy. See *White*, 275 Mich App at 625; MCR 2.116(C)(10).[4]

## G. MCL 450.1489(1)(E)

Defendants next argue that the trial court erred in its valuation of the shares at issue and it ought to have discounted the price for the shares on the basis of marketability and lack of control. We disagree.[5]

One of the several possible remedies for shareholder oppression stems from MCL 450.1489(1)(e): "The purchase at fair value of the shares of a shareholder, either by the

---

[4] To the extent defendants also argue that the trial court erred in not allowing them to depose the independent expert with regard to the remedy in this case, Eric Larson, we will not address this claim of error. Although defendants asserted this claim in the statement of questions presented, they did not address it in any way in their brief on appeal. By failing to analyze this issue, defendants have abandoned it on appeal. *Mitcham v Detroit*, 355 Mich 182, 203; 94 NW2d 388 (1959).

[5] While we have concluded that the trial court improperly granted summary disposition in favor of plaintiffs, we address this issue for the benefit of the trial court on remand if necessary.

corporation or by the officers, directors, or other shareholders responsible for the wrongful acts." It is noteworthy that the Legislature referred to "fair value" rather than "fair market value." "Fair market value" generally refers to "the amount of money that a ready, willing, and able buyer would pay for the asset on the open market[.]" *Wolfe-Haddad v Oakland Co*, 272 Mich App 323, 326; 725 NW2d 80 (2006). A fair market value would, therefore, take into consideration the fact that a ready, willing, and able buyer might discount the value of the shares on the basis of limitations inherent in the shares.

In interpreting their shareholder-oppression statutes, some foreign authorities recognize that it is unfair to discount the value of shares in the context of shareholder oppression because the discounts would in effect allow the majority to force out the minority without paying a fair share of the enterprise's value. For that reason, those authorities have interpreted "fair value" to have a technical meaning that is different than "fair market value." See, e.g., *HMO-W, Inc v SSM Health Care Sys*, 234 Wis 2d 707, 717-723; 611 NW2d 250 (2000) (surveying authorities and concluding that fair value should not be treated as synonymous with fair market value); *Colombia Mgt Co v Wyss*, 94 Or App 195, 202-206; 765 P2d 207 (1988) (noting there are "no hard and fast rules for determining the fair value" of corporate shares and concluding that a minority discount was not appropriate in that case to discern the "fair value" of corporate stock because the statute at issue "is not designed to produce the equivalent of a sale on the open market; rather it is a legislative remedy for minority shareholders who find their interest threatened by significant corporate changes and who may have no other recourse."). Nevertheless, although they recognize that such discounts are generally inappropriate in the context of shareholder oppression, some jurisdictions have recognized that what constitutes a fair value depends on the circumstances of each case. See, e.g., *Brynwood Co v Schweisberger*, 393 Ill App 3d 339, 353; 913 NE2d 150 (2009) ("Some of the factors that may be relevant to a determination of fair value [of corporate stock] include the stock's market price, the corporation's earning capacity, the investment value of the shares, the nature of the business and its history, the economic outlook of the business and the industry, the book value of the corporation, the corporation's dividend paying capacity, and the market price of stock of similar businesses in the industry. Although 'fair value' is not synonymous with 'fair market value,' fair market value is another relevant factor to be considered.") (citations omitted); *Balsamides v Protameen Chem, Inc*, 160 NJ 352, 374-377; 734 A2d 721 (1999) (recognizing that fair value is not synonymous with fair market value and stating that discounts are generally not appropriate except when fairness and equity warrant the application of a discount); *Robblee v Robblee*, 68 Wash App 69, 77-80; 841 P2d 1289 (1992) (surveying cases and holding that a minority discount was not justified under the facts). As such, in our opinion the Legislature used the term "fair value" to distinguish the remedy from purchase at "fair market value." Nevertheless, nothing within the statute precludes a trial court from considering fair market value when determining fair value. See, e.g., *Morley Bros v Clark*, 139 Mich App 193, 197-198; 361 NW2d 763 (1984) (stating that the trial court did not err when it determined the value of the shares on the basis of various valuations, including a net asset approach and a market value approach, under a different statute). Likewise, the statutory scheme as a whole does not preclude a trial court from applying discounts when crafting a remedy.

In providing for relief under MCL 450.1489(1), the Legislature stated that the trial court could "order or grant relief as it considers appropriate[.]" The Legislature further provided that

the relief "may" include "without limitation" the "purchase at fair value of the shares of the shareholder." MCL 450.1489(1)(e). The Legislature did not define "fair value." However, by stating that the trial court "may" order the purchase of the shares at issue at "fair value" "without limitation," the Legislature indicated that trial courts were not required to order such relief, but may do so if appropriate. Stated differently, the Legislature gave the trial court broad authority to fashion its remedy to suit the equities of the case—that is, to fashion a remedy that was "appropriate" under the circumstances. MCL 450.1489(1). As such, while the trial court has the authority pursuant to MCL 450.1489(1)(e) to order that defendants purchase plaintiff's shares at "fair value[,]" nothing within the statutory scheme *required* the trial court to value the shares in any particular way. Given the Legislature's broad grant of authority to craft a remedy for shareholder oppression under MCL 450.1489(1), we conclude that a trial court is required to order an "appropriate" remedy, which may include an order to purchase at "fair value" or any other value that the court concludes is appropriate under the totality of the circumstances. In this case, the trial court had the authority to value the shares without discounts under MCL 450.1489(1)(e), but was not *required* to do so. Because the trial court had the authority to value the shares in any way that was equitable under the totality of the circumstances, the trial court erred to the extent that it felt *compelled* to value the shares without any discounts. See *Ronnisch Constr Group, Inc v Lofts on the Nine, LLC*, 499 Mich 544, 552; 886 NW2d 113 (2016) (stating that a trial court necessarily abuses its discretion when it premises its remedy on an error of law). For the benefit of the trial court on remand, if plaintiffs are successful in their claims and the court again chooses to order the purchase of the shares, we take this opportunity to clarify that it retains the discretion to value the shares in any way it determines appropriate under the totality of the circumstances, including a valuation at fair value as described above.

## H. DEFENDANTS' REMAINING ARGUMENTS ON APPEAL

Defendants next argue that the trial court erred in denying their motion for summary disposition of the claims against LeeAnn McConnell. We disagree.

In their amended complaint, plaintiffs alleged for their seventh claim that each defendant participated in all the wrongful conduct alleged in the first six claims by knowingly and deliberately aiding and abetting each other in the commission of the wrongful conduct described in those claims. Our Supreme Court has held that multiple persons may be liable in tort for a single harm under a concert of action theory; in such a case, the plaintiff need only provide evidence that the defendants were jointly engaged in tortious activity as a result of which the plaintiff was harmed. *Abel v Eli Lilly & Co*, 418 Mich 311, 338; 343 NW2d 164 (1984). A defendant can also be held liable for a tort committed by some other person under a civil conspiracy theory if the defendant combined with another person or persons by some concerted action "to accomplish a criminal or unlawful purpose, or to accomplish a lawful purpose by criminal or unlawful means." *Urbain v Beierling*, 301 Mich App 114, 131-132; 835 NW2d 455 (2013) (citation and quotation marks omitted).

In response to defendants' motion for summary disposition of the claims against LeeAnn McConnell, plaintiffs provided evidence that LeeAnn McConnell repeatedly voted her shares in support of her own family members' control of Burr Oak; she also repeatedly voted to have her husband, her father, and her brothers serve as the directors. Plaintiffs also presented evidence that LeeAnn McConnell stated that she played an important role in determining the direction that

Burr Oak would take, even though she was not a director or officer. In an e-mail, LeeAnn McConnell acknowledged Jeffrey Franks's desire to be appointed as a director, but she stated there were "issues, past and present" with the Franks Family that had to be worked out first. She further wrote that she promised her grandfather that she would ensure that the Oak companies would remain part of the Sturgis community. She indicated that she would continue to do the " 'heavy lifting' " to see to it that that legacy continued. Plaintiffs further cited testimony by Richard Franks in which he testified that LeeAnn McConnell, along with the other defendants, "besieged" him with questions about selling his stock.

A reasonable finder of fact, viewing this evidence in the light most favorable to the nonmoving party, *Maiden*, 461 Mich at 120, could conclude that LeeAnn McConnell knowingly acted in concert with the other defendants to oppress the nonvoting members' interests as shareholders by repeatedly supporting their membership on the board and actively working behind the scenes to further their agenda. However, because there was a question of fact as to whether LeeAnn McConnell participated in the acts of shareholder oppression by the other defendants, *Abel*, 418 Mich at 338, the trial court did not err when it denied defendants' motion for summary disposition of the claims against LeeAnn McConnell, *Barnard Mfg*, 285 Mich App at 369.[6]

### III. CONCLUSION

The trial court's March 27, 2018 order dismissing this action with prejudice is reversed. We also reverse the trial court's October 24, 2016 order granting plaintiffs' motion for summary disposition regarding oppression and the appropriate remedy, and vacate its August 31, 2017 order requiring Burr Oak to purchase plaintiffs' shares within two years for $712 a share. We remand for proceedings consistent with this opinion. We do not retain jurisdiction.

/s/ Kirsten Frank Kelly
/s/ Karen M. Fort Hood
/s/ James Robert Redford

---

[6] Given our disposition of this appeal we decline to address defendants' cursory remaining arguments, not included in their statement of the issues on appeal, addressing the trial court's award of attorney fees and interest to plaintiffs. *Seifeddine v Jaber*, ___ Mich App ___, ___; ___ NW2d ___ (2019) (Docket No. 343411); slip op at 4.